The following informal memorandum was prepared in response to question presented by the Secretary of Education during the October 22, 1991 meeting of the Oklahoma Commission on School and County Funds Management ("Commission")
The memorandum is intended to identify, describe and explain in general terms the federal tax restrictions applicable to the issuance of certificates of indebtedness by Oklahoma school districts and counties The memorandum is not intended to address specific transactions, nor is it intended to substitute for guidance by competent bond counsel.
GENERAL BACKGROUND
Oklahoma law permits school districts and counties to issue short-term financial obligations in the form of certificates of indebtedness 70 O.S. 5-136.1 (1990); 19 O.S. 347 (1990). The certificates are issued to obtain proceeds which are, in turn, used to pay the current expense of the district or county pending receipt of ad valorem taxes or other revenues Such obligations are often referred to as "tax-anticipation notes".
The Internal Revenue Code of 1986 ("IRC") provides that an obligation of a state or a subdivision of a state is a "state or local bond " IRC S 103(C) Because Oklahoma school districts and counties are political subdivisions of the state, the certificates of indebtedness issued by these entities are for federal tax purposes state or local bonds
Interest on state or local bonds is ordinarily excluded from gross income IRC 103(a) That is, state or local obligations, such as certificates of indebtedness, are tax-exempt bonds Tax exempt bonds generally bear a lower rate of interest than other taxable investment. Thus, the special tax status of these obligations effectively reduces the cost of borrowing to governmental entities, such as school districts and counties.
The fact that tax-exempt bonds bear a lower rate of interest than taxable investment also give rise to the potential for "tax arbitrage". Tax arbitrage occur when the proceeds of tax-exempt bonds are invested in taxable investments which bear a higher yield. The Code seeks to restrict tax arbitrage Accordingly, bonds issued by state or local governments which are deemed to be "arbitrage bonds" are not tax-exempt IRC 103(b)(2).
ARBITRAGE BONDS
An obligation is an "arbitrage bond" if at the time the obligation is issued the issuer reasonably expect to use the proceeds to acquire investments which have a higher yield, or to replace funds which were used to acquire investments which have a higher yield IRC 148(A). In addition, an obligation may be treated as an arbitrage bond if the issuer intentionally uses any portion of the proceeds of the issue to acquire higher yielding investments IRC 148(a)
The Code provide an exception, however, to permit the interim investment of bond proceeds An obligation will not be treated as an arbitrage bond — even though the proceeds are invested in instruments that have a higher yield than the obligation — if the proceeds are so invested for only a reasonable temporary period until the funds are needed for the purpose for which the obligation was issued IRC 148(c)(1).
To illustrate the operation of these rules, assume that a school district issues a certificate of indebtedness. If at the time of issuance the district expects or intends to use the proceeds of the certificate to buy and hold investment which have a higher yield than the certificate, then the certificate will likely be deemed to be an arbitrage bond and denied tax exempt status However, if the district expects to use the proceeds of the certificate to pay the legitimate expenses of the district, and invests the funds for only a temporary period until they were actually needed, then the certificate will likely not be treated as an arbitrage bond.
School districts and counties will, no doubt, wish to avoid having the certificates they issue be treated as arbitrage bonds Accordingly, districts and counties should keep two primary considerations in mind when issuing obligations and dealing with the proceeds of those obligations First is the need to ensure that an issue is properly sized; second is the need to comply with the restrictions pertaining to rebate.
SIZING THE ISSUE
The method school districts and counties are to use in determining the size of an issue of tax-anticipation note is outlined in regulations promulgated by the United States Treasury Department. This sizing method is reflected in state law as well.
A. Maximum Cumulative Cash Flow Deficit
The regulations establish an upper limit on the amount of tax anticipation notes a governmental entity may issue. An entity may issue these short-term obligations in an amount not exceeding the "maximum cumulative cash flow deficit" of the issuer The maximum cumulative cash flow deficit of a governmental entity is defined as (1) the amount the entity will depend to pay expenses which would ordinarily be paid out of taxes or other revenue; plus (2) the amount the entity is reasonably required to keep on hand as a cash balance; minus (3) all amounts, other than the proceed of the issue, available to pay such expense Trea Req 1.103-14(c).
For purposes of determining this deficit, the amount of the reasonably required cash balance is deemed to be one month of the entity's anticipated expenditures And in determining which funds are available for the payment of expenditures, all funds are considered to be available to the extent that these funds may, in the absence of legislative or judicial action, be invaded to pay expenses without being reimbursed Treas Reg 1103-14(c).
The state statute that addresses the limitation on school district and county participation in cash management programs also restricts the size of an issuance of a certificate of indebtedness. Because the statute references the deficit calculation method specified in the Code, the statute, as a practical matter, serve to limit the amount of a certificate to the maximum cumulative cash flow deficit of the issuer 60 O.S. 177.2(B) (1990).
In sum, a school district or county may issue a certificate of indebtedness in an amount not to exceed the current expenses of the entity, plus one month's expense as a cushion, and less the current taxes and other revenues to be received by the entity.
Also, the calculations must be made separately with respect to the operating and building funds of a school district or county because, under state law, these accounts are not freely fungible.
B Reasonable Expectations
The determination of an entity's maximum cumulative cash flow deficit is based upon the issuer' is reasonable expectations concerning certain future events. These future events include, inter alia, the anticipated level of revenues, the expected date the revenues will be received and the anticipated amount and timing of expenditures. The regulations do not specifically address what makes an expectation "reasonable " Nevertheless, it is clear that to be "reasonable" an expectation must have some demonstrable basis in reality. This would appear to require that a projection have some supporting basis in historical fact. Conversely, it would appear that a projection which was not consistent with historical data would need to be justified by a credible showing of changed circumstances.
To some extent the regulations allow an issuer to establish its reasonable expectations through an "arbitrage certificate". An arbitrage certificate must be executed by an officer responsible for issuing the obligation and must set forth a brief summary of the facts and estimates on which the issuer's expectations are based The certificate must also state that to the best of the knowledge and believe of the certifying officer the issuer' expectations are reasonable Subsequent events will not affect a proper certification. However, if a certification contains a material misrepresentation, the Commissioner of the Internal Revenue Service may disqualify the issuer Treas Reg 1.103(a)
C. Artifice or Device Overissuance
The regulations contain an anti-abuse provision which prohibits an issuer from employing an "artifice" or "device" in connection with the issuance of governmental obligations An artifice or device is a transaction or series of transactions that attempt to circumvent the arbitrage restrictions so as to increase the burden on the market for tax-exempt obligations and enable the issuer to exploit the difference between tax-exempt and taxable interest rates to gain a material financial advantage An obligation issued through such a transaction will be considered to be an arbitrage bond Treas Reg 1.103-13(j).
To illustrate the kinds of transaction that the Internal Revenue Service considered to be abusive, the regulations set forth a number of examples These examples specifically include selling obligations that would not otherwise be sold and selling more obligations than would otherwise be necessary Thus, the regulations specifically forbid the overissuance of governmental obligations Treas Reg 1.103-13(j).
THE REBATE REQUIREMENTS
In addition to the sizing requirements outlined above, the Code generally requires issuers, including school districts and counties, to rebate any arbitrage earnings to the United States IRC 148(f). The amount of rebate payable is the amount earned from investing the proceeds of the issue, minus the amount which would have been earned if such proceeds had been invested at a rate equal to the yield on the issue IRC 148(f). Where a governmental issuer failed to comply with the rebate requirement, its obligation may be treated a arbitrage bond IRC S 148(f).
EXEMPTIONS FROM THE REBATE REQUIREMENT
The Code provides a number of exemption from the rebate requirement. An issuer will not have to rebate arbitrage earnings on an issue which falls within one of the e exemptions; an issuer will be required to pay rebate on any issue which does not come within an exemption. In the present context, two exemptions are most pertinent the six month pend-out exemption and the small issuer exemption.
1. The Six Month Spend-Out Exemption
An obligation will be exempt from rebate if the governmental entity which issued the certificate expend the proceeds on legitimate governmental expenses within six months of the date of issuance IRC 148(f)(4)(B). The Code creates a special "safe harbor" rule for determining whether the proceed of tax anticipation notes, such as certificates of indebtedness, are expended within six months. Under this rule, a certificate of indebtedness will not be subject to rebate if at some point within six months after the issuance of the certificate, the "cumulative cash flow deficit" of the school district or county exceeds 90% of the proceeds of the issue IRC 148(f)(4)(B).
The "cumulative cash flow deficit" of a school district or county is the amount by which the actual expenses that ordinarily would be paid out of tax or other revenues, exceed the amount of funds available — other than the proceeds of the issue, but including the funds earned from investing the proceeds — during the period for payment of the expenses IRC 148(f)(4)(B).
Because the six month spend-out exemption is based on the issuer's actual cash flow deficit, it essentially creates a "lookback" test. That is, to determine whether a district or county is in compliance, the entity must look back over its actual cumulative cash flow deficit to see if it totals 90% or more of the amount of the proceeds of the certificate. If within six months of the date of the issue the cumulative deficit is 90% or more of the proceeds, then the school district or county will not be required to pay rebate; otherwise, the issue will be subject to the usual rebate requirement.
2 The Small Issuer Exemption
The Code also creates an exemption for small issuers. Under this provision, a certificate issued by a school district or county which will not issue more than $5,000,000 in tax exempt obligation during the relevant calendar year is not subject to rebate if at least 95% of the proceeds of the certificate are to be used to pay the expense of the school district or county IRC 148(f)(4)(D).
Unlike the spend-out exemption, the small issuer exemption creates a prospective or "look-forward" test. This test requires that a school district or county intend, at the time of issue, to spend at least 95% of the proceeds of the certificate on its legitimate governmental expenses. If this intention does not exist or cannot be justified by reasonable protections, then the school district or county must pay rebate.
Incidently, counties which are beneficiaries of public trusts that issue tax-exempt bonds should consider the aggregation rules set forth in 148(f)(4)(D) of the Code in determining whether they meet the exemption's $5,000,000 ceiling.
POTENTIAL CONSEQUENCES OF NON-COMPLIANCE
There are a number of potential consequences which may arise in the event a school district or county fails to comply with the federal and state restrictions pertaining to the issuance of tax exempt certificates of indebtedness. The potential consequences fall generally into three categories.
First are potential federal consequences Certificate that fail to comply may be deemed to be arbitrage bonds within 103 of the Code and denied tax-exempt status. A school district or county might also be required to pay rebate to the United States on past arbitrage earnings. Further, there is the potential that a school district or county would be disqualified from executing arbitrage certificates and would, therefore, be unable to issue additional tax-exempt bonds, including tax-exempt general obligation bonds. Treas Reg S 103-13(a)
Potential state law consequences also exist 60 O.S. 177.3 makes participating in a cash management program without obtaining Commission approval a criminal offense Section 177.3 also makes the submission of false or misleading documents to the Commission a criminal offense. A violation is a misdemeanor punishable by a fine of not less than one thousand dollars and/or imprisonment for up to one year ln the county jail. Any official convicted of this offense may also be removed from office and any professional licenses issued to the official will be revoked.
Finally, there are other collateral consequences to consider in the event a school district or county fails to comply with the applicable arbitrage regulation and a certificate issued by the school district or county is, therefore, deemed to be an arbitrage bond. These include the potential adverse effect on the credit rating of the entity and allow the increased cost or potential inability of the entity to obtain credit enhancement in the future. Moreover, there is a substantial likelihood of additional liability on the part of the school district or county, and perhaps the individual officers, as a result of any breach of the covenants contained in any contract or arbitrage certificate executed in connection with the issuance of the certificate of indebtedness
THE ROLE OF THE COMMISSION
The Commission is directed by state law to oversee the participation of school districts and counties in short-term cash management programs In carrying out this mandate, the Commission has used its best efforts to prepare forms which will enable school districts and counties to comply with all applicable regulations.
Observing the guidelines imposed by state law and the requirements established by the Commission does not necessarily equate with compliance with the federal regulations, however.
The Commission cannot assure school districts and counties that they are in compliance with federal tax law Rather, the ultimate responsibility for compliance with federal arbitrage restrictions falls upon the local school district and county officials who direct that a district or county participate in a program, and who place their signatures on the authorizing documents.
I hope the foregoing memorandum is helpful I have made every effort to ensure its accuracy Please be aware, however, that this informal memorandum represents the views of the undersigned and does not constitute an official opinion of the Attorney General.
(K. W. Johnston)